Ehrlich, J.
This action is not properly one for money had and received, but for damages sustained as alleged, by plaintiff’s assignor, from various causes, all growing out of her transactions with the “Matrimonial Bureau,” kept by defendant, of which she became a patron.
Among other grievances which the complaint sets forth, is one for the payment to defendant of the sum of five dollars as a “ registration fee,” and the deposit with defendant of the further sum of fifty dollars, to be returned on or before August 15, 1887, unless in the meantime defendant should introduce her to some person whom she would be willing to marry, and that defendant refused to return said sum op. demand.
Plaintiff’s counsel, however, in his brief, submitted upon the motion for a new trial, appears to abandon other claims pleaded, and while not controverting the proposition that the agreement may be void as against public policy, insists that the money paid in performance on plaintiff’s part of such agreement, if unlawful, may be recovered back, and desires that the action may be considered in that aspect, and treated as one for that purpose.
The question, therefore, will be so treated and considered.
The agreement, so called, under which was paid the money in suit, is not made void by statute. 3 R.S. (6th ed.), 142, sec. 2, subd. 3.
The statute simply provides that “every agreement, *385 promise or undertaking made upon consideration of marriage, ” shall be void, unless the same shall be in writing.
This is not an agreement in consideration of marriage. The consideration, in effect, was that defendant should render services toward the bringing about of a marriage; there is no pretense that defendant either was to marry plaintiff’s assignor, nor that any other person either married or agreed to marry her, in consideration of the money deposited or otherwise; and plaintiff himself does not aver that defendant promised that any other person should marry her, or even that he would procure a man willing to marry her, but that he (defendant) should undertake to introduce to her some man whom she would be willing to marry.
And finally, if otherwise within the terms of this statute, the due bill offered in evidence would sufficiently satisfy the provision requiring the agreement, or some note or memorandum thereof, to be in writing£ signed by the party to be charged therewith.
With the exception of a single case (62 Barb.’92), where the broker was defeated in an action to recover the agreed compensation for bringing about a marriage with a designated person, no suit involving the question has been discovered in the reported decisions of this state, and no adjudicated case anywhere has been called to the attention of the court wherein the terms of the agreement provided, as in the case at bar, for a general and promiscuous introduction of men formerly strangers to the female applicant, with the express purpose and intent of thereby securing a husband.
The reasonable, if not the necessary, inference is that the parties to be so introduced would not be ignorant of the object of forming such acquaintances on the part of plaintiff’s assignor; therefore no element of fraud or deceit as between the parties can be urged to impair the validity of such a contract.
There is no proof—and there must be no presumption— that any immoral purpose of plaintiff’s assignor was covered under the guise of defendant’s employment; on the other hand, it cannot be held that she was the victim of defendant’s fraud or negligence. The case must be considered and disposed of upon the theory adopted by plaintiff’s counsel.
The contract of marriage, established by divine decree, and being the true foundation of the family and the state, is highly favored by the law of every civilized country. Every other lawful contract, recognized as such by legislatures and courts of justice, may be negotiated and consummated through the agency of others. Is any such attempted agency for the purpose of negotiating marriage contracts void as against public policy ?
*386 To this question none other than an affirmative answer must be given; indeed, none other seems possible. Public policy has been well defined to be that principle of law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good. And no thoughtful advocate, no right-minded citizen, can withhold his assent from the doctrine “that in the law of contracts, the first purpose of the courts is to look to the welfare of the public; and if the enforcement of the agreement would be inimical to its interests, no relief could be granted to the party injured, even though it might result beneficially to the party who made and violated the agreement.”
And it is not too much to say that the sanctioning of “matrimonial agencies” by courts of justice, and the letting loose upon the community of a horde of brokers stimulated solely by the promise of reward, or the hope of gain, intent upon bringing together parties of opposite sexes willing to rush into the marriage relation, would be far more disastrous to the welfare of the people and more subversive of that sound morality which is the corner stone of the social edifice, than would be the legalizing of concubinage or the licensing of prostitution.
It is true that mercenary motives may have a place in the mind of one or both of the parties entering into the nuptial contract, which the courts have neither ability to reach nor power to correct; but the arm of justice is not so shortened, nor is the authority of its ministers so impotent, that they may not effectually discountenance and suppress any attempt to surround the antecedents of the marriage bond with th'e influences and the atmosphere which may pervade an exchange of real estate, a sale of goods on commission, or the making of a “builders’ loan” agreement.
It does not follow because the law recognizes marriage as a Civil compact, that therefore it may be negotiated through agents like any other lawful agreement. While in a sense it is a civil contract, it is far more; it is a relation, divinely ordained to be sacred in its offices and lifelong in its continuing obligations. Out of it as a fountain flow the brightest anticipations, the purest affections, and the tenderest memories of which humanity is capable. It is fitting, therefore, that the administration of civil justice should guard its approaches and environments from all intrusion of sordid traffic or vulgar greed. If brokers could be permitted to make a show of‘off ering marital affections upon the market, the mischiefs to family peace and social order would be innumerable and irreparable.
It follows that any contract to do anything in consideration of any efforts in procuring a marriage is repugnant to public policy, and void.
The question then remains, can money advanced or paid *387 in consideration of such void agreement be recovered back? To this inquiry, sound reason and principle demand that a negative answer shall be given. The halls of justice are not open to any party of full age, and free from mental incapacity who has voluntarily entered into an agreement which is hostile to the public welfare, either in respect of the performance of it, the consideration for it, or any incidents or consequences flowing directly from it. And, therefore, where money has been paid in consideration of the payee doing or agreeing to do something opposed to public policy, it cannot be recovered back, even though the object fails or the payee refuses to perform his agreement.
Money or property so embarked in enterprises at war with the interests of society, is under the ban of outlawry, and in respect thereof the courts will afford the former owner neither protection nor redress.
Although this doctrine is neither novel nor doubtful, but must be regarded as firmly established among the elementary principles of remedial justice, still a reference to a few decisions upholding and enforcing it may illustrate its general scope and application.
A pays B an insurance premium known as a “decoy duck;” that is, one to induce others to underwrite the policy; A cannot recover back the premium so paid. Wilson v. Ducket, 3 Burr, 1361.
A paid B a premium on a policy of insurance of a vessel in which he had no interest and the vessel arrived safely. He brought suit to recover back the premium paid and was non-suited. Lowry v. Bourdieu, Doug., 471.
A agrees to pay B a certain sum in money and goods in consideration of B’s neglect of his duties as trustee of 0. A having paid B some money and goods, it was held he could not recover. Foote v. Emerson, 10 Verm., 338.
A sells B property for cash for the purpose of hindering A’s creditors; the creditors afterwards take the property. B cannot recover the price paid therefor. Surlott v. Beddow, 3 Mon. Ky., 169.
A litigant pays money to his adversary’s attorney upon the latter’s promise to be unfaithful to his client; the money cannot be recovered back, although the attorney refused to perform the bargain and remained true to his client’s interest. Doke v. Patterson, 5 Hun, 558.
The above decisions out of a multitude that might be adduced, show the principles adopted by the courts in dealing with contracts which are adjudged void as against public policy.
Neither the contract itself, nor anything immediately connected with it will be recognized, or be made the substantial subject of a judicial determination; no payment will be enforced, no performance decreed, no consideration *388 recovered back, no defense sustained and no collateral undertaking supported, when the same are the offspring of such a contract.
There can be neither ratification nor rescission of such a contract, for the reason that there is nothing which the law will recognize as a contract. Martin v. Wade, 37 Cal., 168.
For the same reason, courts will not go into the details of such an agreement in order to apportion between the parties the share of guilt chargeable to each; both being equally parties to the unlawful agreement, the pretended rights and obligations of' each thereunder will be equally and alike ignored.
Thus, where A gave his bond to B conditioned to pay the amount of the penalty on his bringing about a marriage with C, the bond is void, and no action can be maintained thereon. Drury v. Hooke, 1 Vern. Ch., 412.
And where A promised to deliver to B the note of the latter, which A held against him, in consideration that the latter would use his influence to secure a marriage between A and 0, the agreement is void and is no defense to a suit on the note. Johnson v. Hunt, 81 Ky., 321,
In the case at bar, if plaintiff’s assignor had given defendant a note instead of the cash, defendant could have maintained no action thereon; if she had promised to surrender to the defendant his written obligation, this would be no defence to an action thereon; but having paid him the cash, plaintiff has no remedy, because the law absolutely declines to interfere between the parties to such a contract in respect thereof.
And in applying this doctrine, the law looks to the general tendency of such a contract, and it is condemned when belonging to a class which the law will not tolerate. Richardson v. Crandall, 48 N. Y., 343, 362.
The principle of estoppel has no application to an agreement which the law holds to be void as against public policy; the law will neither aid in enforcing such a contract nor in restoring what has been lost under it. The parties are simply left in the predicament in which they have placed themselves by their unlawful devices. Hence, the question of hardship or of unjust advantage as between the parties will not be considered. The parties being sui juris and the agreement to do that which the policy of the law forbids having been voluntarily entered into, the court will not be turned aside from its duty to the whole community by any plea of special grievance to the parties.
If money upon such a contract had been obtained from a minor, or had been procured by fraud, mistake or duress, it may well be that plaintiff would be entitled to relief; and the same result might follow if the contract were void as *389 repugnant to public policy, because of the relation of the parties, as in the case of an agent dealing with himself on account of his principal, and not because the thing itself to be done is hostile to the welfare of society.
But no such facts are shown in the case at bar; here, the very thing contracted for, the policy of the law condemns; the parties were of full age, the agreement was voluntarily made and, so far as appears, is tainted with no actual fraud, deceit or oppression on the part of defendant.
Nor is this is a case of money lost by or deposited • upon a wager, or expended in a lottery scheme, or paid by way of usury, in which cases the statute expressly authorizes a recovery, because the law regards the payee as the principal offender and is aimed at his part of the transaction and is adopted for the payor’s protection.
To the appeal of the plaintiff’s counsel, that the policy of law permits the granting of relief to the victim (a woman) in a case like the present, no further answer seems necessary.
The principles of law above adverted to, and which must control the decision of the case at bar, as between parties contracting freely, and each in his own right, recognize neither victim nor oppressor; their sole aim is to protect the public against contracts of a pernicious and dangerous tendency.
The court is not above the law, but as its servant, is bound to administer its precepts, and faithfully declare and royally adhere to its guiding principles.
The motion for a new trial must be denied.